IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MONIKA MICHELLE HILL,

    *Petitioner*,

    v.

UNITED STATES OF AMERICA,

    *Respondent*.

Criminal No.: ELH-13-248

and

Criminal No.: ELH-15-586

**MEMORANDUM OPINION**

This Memorandum Opinion resolves identical motions for compassionate release filed in two criminal cases by and on behalf of Monika Michelle Hill, pursuant to 18 U.S.C. § 3582(c)(1)(A). Because the motions are identical, I shall address them collectively as the "Motion," unless otherwise noted.

In ELH-13-0248 ("Case I"), pursuant to Hill's pleas of guilty, Hill was convicted of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and aggravated identity theft, in violation of 18 U.S.C. § 1028(a)(1). In ELH-15-0586 ("Case II"), following Hill's pleas of guilty, entered under Fed. R. Crim. P. 11(c)(1)(C), Hill was convicted of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; aggravated identity theft, in violation of 18 U.S.C. § 1028(a)(1); and Offense(s) Committed While On Pre-Trial Release, under 18 U.S.C. § 3147(1).

A combined Amended Presentence Report ("PSR") is docketed in Case I at ECF 84 and in Case II at ECF 112.[1] A joint sentencing proceeding was held on June 24, 2016 (ECF 88 in Case I; ECF 109 in Case II). In accordance with the "C plea," Hill received a total sentence of 8 years'

---

[1] It has also been docketed as an exhibit appended to the Government's Opposition. *See* Case I, ECF 147-1, ECF 149-1; Case II, ECF 259-1, ECF 261-1. I shall cite ECF 261-1.

imprisonment as to Case I, and a total sentence of 10 years' imprisonment in Case II, concurrent with the sentence in Case I. She was also ordered to pay restitution of $105,899.66 in Case I and $199,318 in Case II.

Judgments were entered on June 30, 2016. *See* Case I, ECF 90; Case II, ECF 110. No appeal was noted as to either case. *See* Docket.

On May 27, 2020, in Case I and Case II, Ms. Hill, who is 41 years of age, filed a pro se motion for compassionate release. *See* ECF 261-1 at 2. The Motion is docketed in Case I at ECF 131. In Case II, it is docketed at ECF 242. Supplements are docketed in Case I at ECF 136, 137, and ECF 138. Supplements in Case II are docketed at ECF 248 and ECF 251.[2]

Defense counsel entered an appearance on July 27, 2020. Briefing was stayed when defense counsel was appointed. *See, e.g.*, Case I, ECF 134, ECF 135. Then, through counsel, Ms. Hill filed a supplemental motion and memorandum on August 31, 2020. Case I, ECF 141, ECF 143; Case II, ECF 253, ECF 255 (collectively, the "Motion").[3] The defense also submitted several exhibits. The government opposes the motion. Case I, ECF 147, ECF 149; Case II, ECF 259, ECF 261.[4] It also provided several exhibits. Ms. Hill, though counsel, replied. Case I, ECF 151; Case II, ECF 263.[5] And, defense counsel has submitted correspondence concerning health conditions at the penal institution where defendant is incarcerated. Case I, ECF 152; Case II, ECF 264.

---

[2] ECF 138 in Case I contains both case numbers. But, that submission was not docketed in Case II.

[3] For convenience, I shall cite ECF 255.

[4] I shall cite ECF 259.

[5] I shall cite ECF 263.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion.

## I.  Factual Background

On May 15, 2013, in Case I, Hill was indicted on multiple charges of conspiracy to commit wire fraud, wire fraud, and aggravated identity theft, in violation of 18 U.S.C. §§ 1349, 1343, and 1028A(a)(1), respectively.  ECF 1.  On June 4, 2014, pursuant to a Plea Agreement (ECF 62), Hill pleaded guilty to Count One, charging conspiracy to commit wire fraud, and to Count Eight, charging aggravated identity theft.  ECF 61.  Count One carried a maximum penalty of 20 years' imprisonment.  Count Eight carried a mandatory sentence of two years, consecutive.  ECF 62, ¶ 3. The government agreed to recommend a "reasonable sentence."  *Id.* ¶ 10.

The Plea Agreement included "Stipulated Facts."  ECF 62 at 11-13.  The Stipulated Facts established, *inter alia*, that between September 2012 and November 2012, Hill devised a scheme to defraud individuals by stealing their personal identification information.  *See* ECF 205-1 at 43. Hill used that information, and her own photograph, to fabricate drivers' licenses and credit cards. *Id.* at 44.  Along with a coconspirator, Hill traveled to motorcycle dealerships and retail stores in Maryland, Pennsylvania, Virginia, and Delaware, and used the phony documents to purchase goods and apply for lines of credit at the stores.  *Id.*

Specifically, Hill purchased motorcycles, electronic equipment, jewelry, and clothing, valued at more than $120,000.  *Id.*  The scheme included five or more means of identification and involved more than ten victims.  *Id.*  These goods were transported back to Maryland, where the coconspirator listed them for sale online.  *Id.*  The coconspirator paid Hill for her work and kept the proceeds of the sales.  *Id.*

On June 4, 2014—the very day that Hill appeared before this Court to plead guilty in Case I—she deposited forged checks into an account created pursuant to a different fraud scheme.  Case II, ECF 205-2 (Transcript of April 19, 2016), at 58.  A subsequent investigation revealed that from March 2013 to July 2014, Hill participated in a fraud scheme using personal identification information stolen from various individuals.  *Id.* at 56.  As part of the scheme, Hill and her coconspirators opened multiple business accounts at Bank of America ("BOA").  *Id.*  They also used other stolen information to forge checks and deposit them into the business accounts.  *Id.*  The coconspirators completed the scheme by cashing checks drawn on the BOA business accounts.  *Id.* at 57.  The coconspirators retained a small portion of the cash and gave the rest of the funds to Hill.  *Id.*

Notably, Hill engaged in the scheme at issue in Case II while on pre-trial release for Case I, pursuant to an Order dated September 24, 2013 (ECF 28), issued by then United States Magistrate Judge Stephanie Gallagher.  The Order expressly advised Hill that if she committed a new offense while on pre-trial release, she would be subject to additional penalties.  *Id.* at 3; *see* Case II, ECF 205-2 at 59.

On November 12, 2015, in Case II, while Hill was pending sentencing in Case I, a Grand Jury in the District of Maryland returned another Indictment against Hill.  *See id.*; ECF 1.  Hill was charged in multiple counts with conspiracy to commit bank fraud, bank fraud, aggravated identity theft, and the commission of an offense while on pre-trial release, in violation of 18 U.S.C. §§ 1349, 1344, 1028A(a)(1) and (c)(5), and 3147(1), respectively.  Hill was arrested on these charges on November 17, 2015.  ECF 14.

On April 19, 2016, in Case II, Hill pleaded guilty to Count One (conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349); Count Nine (aggravated identity theft, in violation

of 18 U.S.C. § 1028A(a)(1)); and Count Eighteen (committing an offense while on pre-trial release as to Case I, in violation of 18 U.S.C. § 3147(1)).  *See* ECF 70.  The Plea Agreement, docketed at ECF 73, included "Stipulated Facts."  *Id.* at 11-13.

Count One, conspiracy to commit bank fraud, carried a maximum period of incarceration of 30 years; Count Nine, aggravated identity theft, carried a mandatory sentence of two years, consecutive.  *See* ECF 73, ¶ 3.  And, Count Eighteen, Offense(s) Committed While on Pre-Trial Release, carried a sentence of up to 10 years, which sentence was required to run consecutive to the sentences imposed for Count One and Count Nine.  *See id.*

A consolidated sentencing for both matters was held on June 24, 2016.  *See* ECF 88 in Case I; ECF 109 in Case II.  At sentencing, the defendant stood five feet, six inches tall and weighed approximately 200 pounds.  ECF 261-1 at 21.

As to Case I, Hill received six years' imprisonment for Count One and two years, consecutive, for Count Eight.  *See* ECF 90 (Judgment in Case I).  In Case II, Hill received a sentence of six years' imprisonment for Count One; for Count Nine, she received a sentence of two years, consecutive to the sentence for Count One; and for Count Eighteen, Hill received two years, consecutive to the sentences imposed for Counts One and Nine.  ECF 110 (Judgment in Case II).  However, the sentences for Case II were imposed concurrent with the sentences in Case I.  ECF 110 (Judgment in Case II).

Thus, the Court accepted the C plea, and sentenced Petitioner to a total term of 120 months for both cases, with five years of supervised release.  The Court also ordered restitution in the amounts of $105,899.66 for Case I (ECF 90) and $199,318 for Case II (ECF 110); *see also* ECF 205-3 (Sentencing Transcript), at 49.

No appeal was filed by Hill.  However, Hill subsequently filed a post-conviction petition under 28 U.S.C. § 2255.  *See* Case I, ECF 94; Case II, ECF 198, ECF 198-1.  She alleged that she received ineffective assistance of counsel during the plea and sentencing stages of her cases; the Court imposed an illegal sentence; and the Supreme Court's decision in *Dean v. United States*, ___ U.S. ___, 137 S.Ct. 1170 (2017), afforded her the opportunity to ask the Court to reconsider the sentences imposed for Count One in each case, in light of the mandatory nature of the sentences imposed for identity theft (*i.e.*, Count Eight in Case I and Count Nine in Case II).  *See* ECF 94 in Case I; ECF 198 in Case II.

As to "Ground One," which concerned ineffective assistance of counsel, Hill articulated fourteen specific contentions to support her claim.  With regard to Ground Two, alleging "Illegal Sentence," she advanced four contentions to support it.

By Memorandum Opinion and Order of June 13, 2018, I denied the Petition.  Case I, ECF 122, ECF 123; Case II, ECF 226; ECF 227.

Hill is now 41 years of age.  *See* ECF 261-1 at 2.  She is presently incarcerated at FCI Tallahassee.  ECF 255; ECF 259 at 4.  Hill has served approximately 60% of her sentence, beginning with her detention in November 2015 and adjusted for good time credit. ECF 255 at 12, n.6.[6]  With good time credit, she has a projected release date of February 2, 2024.  *See* ECF 261 at 4; *Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed November 10, 2020).  And, according to the defendant, the Bureau of Prisons ("BOP") could release her to a halfway house earlier than February 2, 2024.  *Id.*

---

[6] Defendant asserts that, as of August 31, 2020, she had served 57% of her sentence.  ECF 255 at 12 n.6.  The government did not dispute that calculation.

While Hill has been serving her sentence, she incurred two disciplinary infractions in September 2018.  One was for possession of a cell phone; the second was for possession of a "bubble gun and altered bag."  *See* ECF 261-2 at 1; ECF 261 at 4.

The defendant's medical records from May 9, 2019, reflect that she then weighed 210 pounds.  ECF 255-2 at 2.  This weight yielded a body mass index ("BMI") of 33.9.  *See* ECF 255 at 6; ECF 261 at 20; ECF 261-1 at 21.[7]  And, according to the defendant, she now weighs more than she did in May 2019, with a corresponding increase in her BMI.  The Motion states: "Ms. Hill reports that her weight is actually 225 lbs, which would make her BMI 36.3."  ECF 255 at 6, n.1.  Hill clearly qualifies as obese, according to the Centers for Disease Control and Prevention ("CDC").  *See* ECF 255 at 6; ECF 261 at 20; *Adult BMI Calculator*, Centers for Disease Control and Prevention, *supra*.

Hill has also been diagnosed with and treated for hypertension, ECF 255 at 6; 261-4 at 2, and bipolar disorder.  ECF 255 at 9; ECF 255-2 at 2; ECF 261-1 at 21; ECF 261-4 at 2.  In addition, Hill asserts that she "suffers from latent tuberculosis."  ECF 255 at 8.  The record of a medical screening on March 17, 2020, submitted by the government, indicates that the defendant does not have "communicable" or "active tuberculosis."  ECF 261-4 at 45.  But, Hill asserts that she has not been seen by a doctor since arriving at FCI Tallahassee.  ECF 263 at 7.

On July 31, 2020, Hill, through counsel, requested consideration for compassionate release from the Warden of FCI Tallahassee.  ECF 255-1.  Hill asserts that she has not "received a final decision from the warden."  ECF 255 at 2.

Additional facts are included, *infra*.

---

[7] *See also Adult BMI Calculator*, Centers for Disease Control and Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calcul ator.html (last accessed November 11, 2020).

## II.  Legal Standard

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant *see*king compassionate release had to rely on the BOP Director for relief.  *See, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying motion for compassionate release because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term

of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with the policy statement issued by the Sentencing Commission in U.S.S.G. § 1B1.13.

"When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence

reduction").

U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." U.S.S.G. § 1B1.13(1)(A) provides for a sentence reduction based on "extraordinary and compelling reasons," and § 1B1.13(1)(B) provides for a reduction based on age, in combination with other requirements. U.S.S.G. § 1B1.13(2) establishes as a relevant factor that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The Application Notes permit compassionate release based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows (emphasis added):

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D) is titled "**Other Reasons.**" It permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D).

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *Taylor*, 2020 WL 5412762, at * 1.

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 827. But, compassionate release is a "rare" remedy. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[8]

Defendant filed her Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 223 (D. Md. 2020).  That crisis is COVID-19.[9]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Ctrs. For Disease Control & Prevention (Apr. 2, 2020), https://bit.ly/2XoiDDh.  Moreover, although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted).  As of November 11, 2020, COVID-19 has infected approximately 10.3 million Americans and caused nearly 240,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Nov. 11, 2020).

---

[8] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[9] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

The COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393 (6th Cir. 2020). Indeed, for a significant period of time, life as we have known it came to a halt. Although many schools, colleges, and businesses have now reopened, some remain closed. And, in view of the recent resurgence of the virus, schools, colleges and businesses that had opened are again facing closure or restrictions.

Unfortunately, there is currently no vaccine, cure, or proven treatment that is available. Moreover, according to the Centers for Disease Control and Prevention ("CDC"), certain risk factors increase the chance of severe illness. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (November 2, 2020), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include

cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the BMI is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; smoking; sickle cell disease; pregnancy; and Type 2 diabetes.

The CDC has also created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include cerebrovascular disease, hypertension, pregnancy, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, smoking, and Type 1 diabetes. *See id.* Moderate to severe asthma is an underlying medical condition that was moved to the new category by the CDC; it is now identified as a condition that "might" put an individual at higher risk for COVID-19 complications. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed Nov. 11, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see also Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they readily able to isolate themselves. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention

centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL

3105094, at *9.   Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  *See* ECF 745 at 10-12 (detailing measures that BOP has implemented at BOP facilities).   Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, however, the virus persists in penal institutions.[10]  As of November 11, 2020, the BOP had 125,293 federal inmates in BOP-managed institutions, 14,298 federal inmates in community-based facilities, and approximately 36,000 staff.  Also as of November 11, 2020, the BOP reported that 2,455 inmates and 981 BOP staff currently tested positive for COVID-19; 17,067 inmates and 1,543 staff had recovered from the virus; and 135 inmates and two staff member have died from the virus.  Moreover, the BOP has completed 73,247 COVID-19 tests.  *See COVID-19*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed Nov. 11, 2020).

---

[10] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2.   More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

With respect to FCI Tallahassee, where the defendant is a prisoner, as of November 11, 2020, the BOP reported that 45 inmates and 14 staff members currently have tested positive for COVID-19 and 95 inmates and 11 staff have recovered at the facility. No inmates have died. And, the facility has completed 674 COVID-19 tests of inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Nov. 11, 2020).

### IV. Discussion

Hill has moved for compassionate release on the ground that her health conditions render her particularly vulnerable to COVID-19. *See* ECF 255 at 6-11. As noted, she explains that she suffers from obesity and hypertension, each a risk factor for COVID-19 identified by the CDC, as well as bipolar disorder and latent tuberculosis. *See id.* With respect to her latent tuberculosis, Hill asserts that becoming infected with the coronavirus would "activate[]" the "dormant tuberculosis" and then "spread rapidly within her unit and the prison." *Id. at* 9. As to the defendant's bipolar disorder, she asserts: "The concern is that [Hill's] combination of other physical health issues, in conjunction with her mental health concerns, will feed each other through immunodeficiency that causes illness, panic attacks and stress that, in turn, will worsen the course of the coronavirus if she contracts it." *Id.* Further, the defendant contends that she is not a danger to the community and that the factors under 18 U.S.C. § 3553(a) favor release. ECF 156 at 11-15.

The government concedes that Hill's obesity constitutes an extraordinary and compelling reason for relief under U.S.S.G. § 1B1.13. ECF 261 at 20. But, the government disputes that Hill's hypertension, bipolar disorder, and latent tuberculosis constitute extraordinary and compelling reasons. *Id.* at 20-24. And, in any event, the government maintains that the defendant is a danger to the community and that the § 3553(a) factors militate against reducing her sentence. *Id.* at 25-30.

### A. Exhaustion of Administrative Remedies

As noted, on July 31, 2020, Hill, through counsel, requested consideration for compassionate release from the Warden of FCI Tallahassee.  ECF 255-1.  And, Hill claims she did not receive a decision from the Warden.  ECF 255 at 2.

The government responds: "The institution does not have a record of having received [the request for compassionate release]; a case manager attempted to follow up with the Defendant, but received no response."  ECF 261 at 5.  However, the government also "concede[s] that the Defendant has exhausted administrative remedies."  *Id.*

Given the government's concession, the Motion is ripe for review under 18 U.S.C. § 3582(c)(1)(A).

### B. Extraordinary and Compelling Circumstances

The parties dispute whether Hill's hypertension, bipolar disorder, and latent tuberculosis render her especially vulnerable to COVID-19.  *See* ECF 255 at 5-10; ECF 261 at 20-22.  However, the Court need not resolve these disagreements in light of the government's concession that, pursuant to the position of the DOJ, Hill's documented obesity constitutes an "extraordinary and compelling" basis for relief.  ECF 261 at 20.

### C. Analysis

The Court must consider whether, if released, Hill would pose a danger to the community, as provided in 18 U.S.C. § 3142(g).  *See* 18 U.S.C. § 3582(c)(1)(A)(ii).  The Court must also consider the factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any

pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The government urges the conclusion that Hill would pose "a clear economic danger" to the community if released. ECF 261 at 29. It asserts, *id.* at 27:

> The specific danger posed by the Defendant's release is clear and stark – that she might again engage in criminal conduct to defraud businesses and members of the public. This assertion is supported by the fact that the Defendant continued to be an active participant in a brazen fraudulent scheme while on Pre-Trial Release. Given that the Defendant has a past history of utilizing the internet to perpetrate fraudulent behavior, there is great risk that she would resume her criminal activities.

As indicated, the government emphasizes that Hill engaged in the conduct that led to Case II while on pretrial release for Case I. Further, the government underscores the defendant's "lengthy criminal history," and the fact that she apparently "used her minor son as a prop perhaps to disguise or distract while conducting the fraudulent transaction" that led to Case II. *Id.* at 27-28.

Hill acknowledges the seriousness of the crimes at issue here. ECF 255 at 11. But, she asserts that she has "accepted responsibility . . . ." *Id.* It is somewhat difficult to square this assertion with the post-conviction petition that Hill filed in 2017, asserting numerous grounds. Among other things, Hill alleged that she received ineffective assistance of counsel and that the Court imposed an illegal sentence. *See* Case I, ECF 94; Case II, ECF 198. In particular, Hill advanced fourteen contentions in support of her ineffective assistance claim and four in support of the illegal sentence claim, all of which I rejected. *See* Case I, ECF 94, ECF 122, ECF 123; Case II, ECF 198, ECF 226, ECF 227. The sheer number of contentions casts doubt on how much Hill had in fact accepted responsibility, at least as of 2017.

Nonetheless, Hill maintains that she would not pose a danger to the community if she were released.  ECF 255 at 11.  In support, she highlights that the crimes involved "neither weapons nor allegations of violence."  *Id.*  Hill elaborates, *id.* at 12:

> Ms. Hill demonstrated her true ability to change by mitigating her conduct by enrolling and completing 15 or more programs within the BOP including helping the organization of a woman's empowerment program.  These acts demonstrated that she possesses a fine moral compass and has the ability to evolve, from the person who committed these crimes, to someone who will obtain gainful employment, make substantial payments towards restitution and avoid future criminal entanglements.

Although the offenses at issue here did not involve weapons or violence, the offenses are nevertheless very troubling.  The conspiracies and schemes that Hill helped orchestrate caused significant economic harm.  The Court ordered restitution of $105,899.66 for Case I (ECF 90) and $199,318 for Case II (ECF 110); *see also* Case II, ECF 205-3 (Sentencing Transcript), at 49.  The magnitude of the damage Hill's crimes caused is relevant to the analysis, even though the crimes did not involve weapons or violence.

Hill's criminal history is also relevant.  Between the ages of 22 and 24, the defendant accrued three federal convictions for conspiracy to distribute controlled substances or possess with intent to distribute controlled substances.  ECF 261-1, ¶¶ 68, 77, 80.  Hill received three concurrent 97-month sentences.  *See* ECF 261-1, ¶¶ 68, 77, 80; ECF 205-3 at 44.  As noted at sentencing, regardless of whether "those were three separate convictions or one big conspiracy that somehow ended up in three convictions," it is of relevance here that when the defendant committed the crimes at issue here, she had already "been through the Federal system."  ECF 205-3 at 44.  Despite serving significant time on the drug convictions, Hill continued on the wrong path.

Hill's conduct that led to her current convictions illustrates this same troubling pattern even more starkly.  As indicated, Hill was indicted on multiple charges in Case I in May 2013.  Case I, ECF 1.  Yet, the indictment in Case I did not deter her from engaging in another fraud scheme over

the course of the following year, as her involvement in the scheme that led to Case II ran from March 2013 to July 2014. Case II, ECF 205-2 at 56. And, most strikingly, on the very day that Hill appeared before this Court to plead guilty in Case I, she engaged in conduct that led to Case II. *See id.* at 58; Factual Background, *supra*. Such conduct casts serious doubt on the suggestion that Hill would comport herself lawfully if released.

To be sure, the Court commends Hill for her participation in several rehabilitative programs while incarcerated. But, her record during incarceration has not been spotless; she has incurred two disciplinary infractions, as mentioned. One was for possession of a cell phone. This violation suggests that Hill is not yet willing to abide by the rules, and, in turn, this bears on the Court's ability to credit Hill's claim that she would not pose a risk to the community if released.

In addition to the nature of Hill's crimes, her prior criminal history, and her disciplinary infractions, the length of her sentence also weighs heavily here. The Court was lenient in its disposition. Count One in Case I carried a maximum period of incarceration of 30 years. *See* ECF 73, ¶ 3. And, Count Eighteen in Case II, Offense(s) Committed While on Pre-Trial Release, carried a sentence of up to ten years. *See id.* However, the Court accepted the C plea, and sentenced Petitioner to a total term of 120 months for both cases. The defendant has only served 60% of that ten-year sentence.

For all of these reasons, the Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time. But, **nothing in this Memorandum Opinion is meant to dissuade the BOP from releasing Hill to home confinement, pursuant to 18 U.S.C. § 3642(c).**

### V. Conclusion

For the foregoing reasons, I shall deny the Motion, without prejudice. *See* Case I, ECF 131, ECF 141, ECF 143; Case II, ECF 242, ECF 253, ECF 255. A separate Order follows.

Date:   November 16, 2020                        _____/s/_____

                                                 Ellen L. Hollander
                                                 United States District Judge